Filed 5/13/24  P. v. Stolte CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PRESTON BERNARD STOLTE,<br><br>    Defendant and Appellant. | D080636<br><br><br>(Super. Ct. No. SCN414344) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Reversed in part, affirmed in part as modified, remanded for resentencing.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

Preston Bernard Stolte was charged with 12 counts of forcible lewd conduct upon a child under 14 years of age (Pen. Code, § 288, subd. (b)(1);

counts 1 through 5 and 8 through 14) and two counts of attempt of the same (§§ 664, 288, subd. (b)(1); counts 6 and 7). Counts 1 through 7 concerned conduct against Grace, and counts 8 through 14 alleged acts against Sophia. A jury found Stolte guilty of all charges except count 4 and found true several special allegations. The court sentenced Stolte to a determinate prison term of eight years, plus an indeterminate term of 45 years to life. Stolte raises four main issues on appeal.

First, Stolte argues all counts must be reversed because there is no substantial evidence he committed the alleged acts by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury, as required to support a conviction of forcible lewd conduct (§ 288, subd. (b)(1)). He further contends there is not sufficient evidence that he committed the acts alleged in counts 3, 5, 6, 12, and 13 to support even the lesser-included offense of lewd conduct (§ 288, subd. (a)). We conclude substantial evidence supports each alleged act of lewd conduct but that there is insufficient evidence to support a conviction of forcible lewd conduct.

Second, Stolte claims his rights to due process and a fair trial were violated when the children's mother (Mother) revealed to the jury his prior prison commitment even though the court gave a curative instruction. Stolte forfeited this issue by failing to move for mistrial. We decline to reach the merits and find no ineffective assistance of counsel on this record.

Third, Stolte makes several claims of prosecutorial error. We conclude each claim is meritless.

Finally, Stolte argues the matter must be remanded for resentencing because the trial court failed to recognize its discretion to sentence counts 9 and 10 concurrently instead of consecutively. We conclude consecutive

2

sentencing of counts 9 and 10 was required where the trial court could have reasonably found the alleged acts occurred on separate occasions.

We reverse in part, affirm in part as modified, and remand for resentencing.

## I.

Mother met Stolte in late April 2020, just a few weeks before the alleged conduct. Grace and Sophia were respectively 8 and 11 years old. Mother and the children had been living alone since the children's father's passing in 2018. The children both had post-traumatic stress disorder from witnessing their father verbally and physically abuse Mother. Grace was severely autistic, was difficult to discipline, and had a mood affective disorder and attention-deficit/hyperactivity disorder (ADHD). Sophia also had ADHD and suffered from depression. Mother had some medical issues, was unemployed, had no help at home, and was unable to drive.

Mother's friend, Mike, wanted her to have someone living as a tenant on her large property to help out. When Mike learned Stolte, who he had known for two years, needed somewhere to park his RV, he introduced Mother and Stolte at a barbeque and they got along well. Mother and Stolte agreed he would pay her $300 per month to park his RV and live on the property, and he would help her care for the children. They had sexual intercourse that night and a few more times once Stolte moved onto the property.

Stolte moved onto the property several days after meeting Mother. He was 27 years old. He had already become acquainted with the children at the barbeque where he played tag with them, pushed them on a swing, and taught them how to shoot a bow and arrow. Stolte testified that he was "just

3

as close as anybody could be, you know, knowing children for only a couple weeks."

By May 6, the children were spending time in Stolte's RV late at night. They would play video games, watch television, and have "stakeouts" to look for coyotes. The children also slept in his RV several times, sometimes with Mother but mostly without. Grace would sleep in the top bunk with Stolte, facing opposite directions, and Sophia slept on the couch. Stolte enacted a "star program" for the children to encourage good behavior. If the children received three stars in one week, they could choose an activity. When Grace earned three stars, she went to Stolte's mother's house to see farm animals. Another day, Stolte took Grace to work with him, then to get ice cream as a reward for behaving well.

On May 16, Mother had a scheduled colonoscopy and asked Stolte to watch the children. He took them to the beach and drove Mother home after her procedure. Once home, Mother took medication and "pass[ed] out" from the pain. The next morning, Sophia told her Stolte had "'inappropriately touched'" her the night before. Grace told Mother Stolte had also touched her inappropriately. Mother called Mike, who called the police. As later instructed by a detective, Mother pretextually called Stolte to ask if he had ever touched the children, which he vehemently denied.

Grace and Sophia were forensically interviewed on May 21 and May 28. Grace said Stolte touched her "no-no square" or "private parts," with his other hand around her back rubbing her "u-bottom." He also touched her chest and neck, tried to kiss her, and made her touch his "no-no square." The following day, before she told Mother what happened, Stolte tried to grab her hand and said, "all I need is your hand," but Grace was reluctant to tell the

4

interviewer anything more about this exchange. Sophia disclosed that Stolte kissed her neck and touched her leg, chest, butt, and "no no place."

The district attorney charged Stolte with the following counts of forcible lewd conduct and attempted lewd conduct, alleging he: (1) touched Grace's buttocks, over clothes; (2) touched Grace's vagina, over clothes; (3) touched Grace's breasts, over clothes; (4) kissed Grace's neck; (5) pulled Grace's hand on his penis; (6) attempted to pull Grace's hand on his penis; (7) attempted to kiss Grace's lips; (8) touched Sophia's leg, over clothes; (9) touched Sophia's vagina, over clothes; (10) touched Sophia's breasts, over clothes; (11) kissed Sophia's neck; (12) touched Sophia's buttocks, under clothes; (13) touched Sophia's vagina, under clothes; and (14) touched Sophia's breasts, under clothes.

Trial started in April 2022. The jury watched video recordings of the interviews, which were available to watch in the deliberation room. Some of Grace's and Sophia's trial testimony conflicted with their forensic interview statements, as detailed below. Namely, Grace testified she did not remember Stolte touching her chest. She also acknowledged saying at the preliminary hearing that she never touched his "'D' word." Sophia testified that Stolte did not touch her butt or her vagina under her garments.

Stolte testified at trial and denied inappropriately touching either child. Three longtime friends of Stolte testified as to his good character.

After three hours of deliberation and no substantive questions, the jury convicted Stolte of all charges except count 4 (kissing Grace's neck).

II.

A.

First, Stolte argues there was insufficient evidence that he: (1) committed any lewd acts on the children "by use of force, violence, duress,

5

menace, or fear of immediate and unlawful bodily injury," as section 288(b)(1) requires; and (2) committed the lewd acts alleged in counts 3, 5, 6, 12, and 13 to support even the lesser-included offense under section 288(a). Based on our view of the record and the applicable standard of review, we conclude substantial evidence supports the convictions under section 288(a) but there is insufficient evidence to support the convictions under section 288(b)(1).

1.

In assessing a claim of insufficient evidence, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 [cleaned up] (*Houston*).) "[T]estimony of a single witness is sufficient to support a conviction." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 93 (*Mejia*).) We do not reweigh evidence or reevaluate a witness's credibility, and we presume every reasonable inference in favor of the judgment. (*Houston*, at p. 1215.) If the circumstances reasonably justify the jury's findings, the judgment must be affirmed even if the circumstances might also reasonably support a contrary finding. (*Ibid*.) Given this court's limited role on appeal, an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

2.

Section 288(a) makes it a felony for any person to "willfully and lewdly commit[] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of

that person or the child." Section 288(b)(1) increases the penalty for the felony if the person "commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." On appeal, Stolte contends there was insufficient evidence of the additional requirement for subdivision (b)(1). The People argue there was sufficient evidence to support a finding of duress; however, we disagree.

In the context of section 288, duress means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1023 [cleaned up].) The test is objective. (*People v. Soto* (2011) 51 Cal.4th 229, 246.) The focus is on the perpetrator's actions, not the victim's response, and the trier of fact should consider all relevant circumstances, including the age of the victim and the victim's relationship to the abuser. (*Id.* at p. 246, fn. 9.)

The People identify no evidence that Stolte did or said anything to threaten the children. As such, relying on *People v. Cochran* (2002) 103 Cal.App.4th 8 (*Cochran*), *People v. Veale* (2008) 160 Cal.App.4th 40 (*Veale*), and *People v. Pitmon* (1985) 170 Cal.App.3d 38 (*Pitmon*), the People argue Stolte used psychological coercion to impliedly threaten the children.

In *Cochran*, this court stated that "[t]he very nature of duress is psychological coercion," and the "fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant." (*Cochran, supra*, 103 Cal.App.4th at pp. 14-15.) There,

the victim was the defendant's daughter, "who engaged in sex acts only in response to her father's parental and physical authority." (*Id.* at p. 15.) A videotape showed the defendant directing his daughter to engage in various sexual acts, and it was "clear the daughter is reluctant to engage in the activities . . . and only continues reluctantly and as a matter of compliance with parental authority." (*Id.* at pp. 12, 15.)

In *Veale*, Division Two of this court concluded the totality of the evidence was sufficient to support a finding that the defendant molested the victim by means of duress. (*Veale, supra*, 160 Cal.App.4th at p. 47.) The victim was the defendant's seven-year-old stepdaughter. (*Id.* at pp. 44, 47.) She was afraid something might happen to her or her mother and feared the defendant would kill someone or hurt her if she told anyone, although the defendant never said he would. (*Id.* at pp. 44-45.) During a forensic interview, the victim could not say why she feared the defendant. (*Id.* at p. 45.) At trial, she testified the defendant did not threaten her or use physical force when committing the charged offense. (*Id.* at p. 46.) Nonetheless, the Court of Appeal concluded "[a] *reasonable inference* could be made that defendant made an implied threat sufficient to support a finding of duress, based on evidence that [the victim] feared defendant and was afraid that if she told anyone about the molestation, defendant would harm or kill [her], her mother or someone else." (*Id.* at p. 47, italics added.) Additional factors supporting a finding of duress included the victim's young age when molested, the disparity between the victim and the defendant's age and size, and the defendant's position of authority. (*Ibid.*) The court recognized that although the defendant was not the victim's father as in *Cochran*, he held a similar position of authority in the household. (*Id.* at p. 49.)

8

On the other end of the spectrum, the defendant in *Pitmon* was a stranger whom the victim "encountered in a fairly isolated location." (*Pitmon, supra*, 170 Cal.App.3d at p. 51.) The Court of Appeal also noted that the victim was eight years old, an age at which adults are commonly viewed as authority figures. (*Ibid.*)

The People contend that like these cases, the children here viewed Stolte as an authority figure. They urge "the [children] were under considerable duress and experienced fear when [Stolte], an adult older and larger than them, molested and then told each of them to keep it a secret." The People also argue Stolte committed the acts "by means of duress based on his physical dominance and his relationship with them as a new authority figure."

Stolte concedes that the disparate age and size concerns of *Cochran*, *Veale*, and *Pitmon* also apply here, but he argues that those factors alone, without relevant aggravating facts, do not support a finding of duress. We agree. Although the children testified that they feared Stolte and viewed him as an adult with authority, there is no evidence they feared Stolte before or at the time of the lewd conduct, or that his relatively short-term relationship with them had a coercive effect. As such, there is no evidence from which to reasonably infer Stolte psychologically coerced the children to perform or submit to acts they otherwise would not have.

There is no dispute the children feared Stolte and were afraid something bad would happen if they told anyone what he did. Grace testified Stolte told her to "'keep this a secret,'" and she did not feel like she could tell anyone because she felt "like if I told someone and he found out, like he was going to shoot me with a gun or something." During the forensic interview, Grace said she was "pretty sure" if she told his secret, Stolte would say that

9

he would "have to, you know, hurt you really bad or something." Sophia testified she feared Stolte *after* the incident, because "I was afraid he might do it again or something worse." She did not know what "something worse" would be but was "really scared." However, none of this evidence shows or supports a reasonable inference the children were afraid of Stolte before or at the time of the incident such that their fear caused them to acquiesce to Stolte's conduct.

Similarly, while there is evidence the children viewed Stolte as an adult with authority, there is no evidence his relationship with the children had a coercive effect. This is not a case of a child being repeatedly molested by a father or stepfather, where "duress will be present in all but the rarest cases." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072-1073.) Nor did the relationship have the dynamic of a child being secluded and alone with a stranger. (See *Pitmon, supra*, 170 Cal.App.3d at p. 51.) Grace testified Stolte was an adult, adults are treated with respect, and she therefore treated Stolte with respect. During the forensic interview, Sophia explained that Stolte did not say what could happen if she told someone, "[b]ut he was an adult and he had the authority . . . and I knew that." Within days of Stolte moving onto the property, the children were sleeping in his RV, Grace slept in the same bed with him, he took them on excursions alone, and he initiated a reward system for good behavior: all indicators the children viewed Stolte as an authority figure. This does not, however, reflect a coercive environment in which the children felt they had to acquiesce to Stolte's conduct, such as when a father figure is living in the home so that a child has no choice but to comply with his rules and direction.

On this record, we cannot conclude there is substantial evidence to support a reasonable inference that Stolte used direct or implied threats to

10

coerce the children to perform or submit to acts they otherwise would not have. Therefore, we conclude there is insufficient evidence to support a finding of duress under section 288(b).

3.

Stolte separately contends there is insufficient evidence to support even the lesser included offense under section 288(a) for counts 3, 5, 6, 12, and 13. Stolte argues the children's trial testimony "made very clear" the acts alleged in those counts did not occur. Pointing to the children's statements during the forensic interviews describing how the alleged acts occurred, the People argue that while some of their trial testimony two years later contradicted their earlier statements, there is ample evidence to support the convictions. We agree with the People.

Count 3 charged Stolte with touching Grace's breasts over her clothes. Stolte challenges this conviction based on Grace testifying twice during trial that she did not remember him doing so. At trial, she also confirmed that she denied such acts at the preliminary hearing. However, during her first forensic interview, when asked if "he touched you there also, on the chest," Grace replied, "yeah." Later in the interview, she again said Stolte "started to touch my chest," and when asked "what did he touch your chest with," she replied, "His hands. All of it was hands."

In count 5, Stolte was charged with pulling Grace's hand onto his penis, and count 6 charged attempt of the same. Stolte contends Grace denied these acts at trial, relying on her testimony that "I think he was going to, but no, I didn't. I didn't do it." She further testified that "he [said] like, 'Just, I need your hand.' And I'm like 'No. No, thank you.' And then I just gave him the coffee." At trial, Grace explained that this was the same day she told Mother what happened the night before, which is consistent with her second forensic

11

interview, when she stated, "The next day he said all I need is your hand." When asked what Stolte's hands were doing when he said that, Grace stated, "He pointed at me. He was about to grab my hand. That's when he said, all I need is your hand." Stolte does not address why this is insufficient evidence of attempt for count 6. Regarding count 5, Grace said during the first interview that the night of Mother's colonoscopy, "he also made me touch his no-no square, like that, but not under underwear." Grace also called it the "D word" and said it felty "pointy" and "round."

Count 12 charged Stolte with touching Sophia's buttocks under her clothes. He argues this conviction must be reversed because Sophia testified at trial that he did not touch her buttocks. However, during the first forensic interview, when asked, "did he touch any other parts of your body," Sophia responded, "My butt." When asked during the second interview, "he touched you where next?" Sophia responded, "On my butt." She said his hand went "underneath" her shorts and was "squeezing it."

Finally, in count 13, Stolte was charged with touching Sophia's vagina under her clothes. He challenges this conviction because at trial, Sophia testified he touched her vagina on top of her garments and "didn't really touch under the garments." Stolte also points to Sophia's trial testimony that he touched her thigh below her shorts but said "no" when asked "did he try to go any higher?" During the second forensic interview, Sophia had a difficult time discussing the way Stolte touched her "no-no spot," saying, among other things, "Sorry. I cannot tell that" and "Well, I'm sorr – . . . I don't wanna . . . I don't wanna think about it." She was eventually able to tell the interviewer that "first it was like around here on my shorts," and "a little later on then he started touching underneath," "around the underwear," "and then underneath the underwear."

12

Stolte claims he does not ask this court to reweigh the evidence. However, in asserting the children's trial testimony "established that counts 3, 5, 6, 12, and 13 did not occur at all," and "was entirely consistent" "[o]n these counts alone," he ignores their contrary statements during the forensic interviews indicating that the alleged acts did occur. Notably, Stolte does not argue that the children's interview statements were not "reasonable, credible, and of solid value" and thus not substantial evidence. The verdict shows the jury credited those statements, as they were entitled to do. Resolution of conflicts and inconsistencies in the evidence is the exclusive providence of the trier of fact and is not reviewable on appeal. (*Mejia, supra*, 155 Cal.App.4th at p. 93.)

Based on the foregoing, we conclude substantial evidence supports the findings that Stolte committed the acts alleged in counts 3, 5, 6, 12, and 13.

### B.

Second, Stolte argues the court should have declared a mistrial after Mother revealed that he had previously been in prison. At defense counsel's request, the court instructed the jury to disregard that statement and admonished Mother to not make any other statements on that subject. Stolte claims the trial court's admonishment was insufficient and mistrial was required. Although his counsel did not request a mistrial, he argues we should exercise our discretion to reach the merits of this issue; in the alternative, he asserts an ineffective assistance of counsel claim. The People contend Stolte cannot establish ineffective assistance of counsel and that, in any event, mistrial was not required. We decline to reach the merits of Stolte's claim and cannot conclude, on this record, that counsel was ineffective.

13

During the prosecution's case, when the prosecutor asked Mother why she believed she should have taken more time to get to know Stolte before allowing him to live on the property, Mother responded, "Well, because he had told me about being in prison before —." Defense counsel objected. At side bar, defense counsel explained that Stolte's criminal past was excluded except for impeachment and acknowledged that the prosecutor "did not elicit that specific answer from her, but I think she needs to be admonished not to discuss that." The court accepted the prosecutor's representation that he had told Mother not to discuss Stolte's prison time, as well as his explanation that although he did not know why she would volunteer that information, she had been extremely nervous. Defense counsel requested that the court instruct the jury to disregard the testimony. The court did so accordingly, stating that Mother "made a mention that she believed that Mr. Stolte had served time in prison. That's something that's not relevant at all to this case and, as a result, I'm ordering you to disregard that statement. Don't speculate about it or why she might have said that."

Because Stolte did not move for a mistrial, he forfeited his argument that mistrial was required. (*People v. Chatman* (2006) 38 Cal.4th 344, 368.) Anticipating forfeiture, Stolte urges us to exercise discretion to review this issue, claiming Mother's statement and the trial court's insufficient admonishment constituted structural error and a violation of his right to a fair trial. The cases that Stolte cites do not support his position and do not involve admission of objectionable testimony but rather (1) a *People v. Mello* (2002) 97 Cal.App.4th 511 instruction, which has been previously held to be structural error (*People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649-650); and (2) an assertion of biased questioning by the trial court during voir dire,

14

affecting the defendant's right to an impartial jury (*People v. Whalen* (2013) 56 Cal.4th 1, 28).

The issue here is different. "'Juries often hear unsolicited and inadmissible comments[,] and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment.'" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428-1429.) A curative instruction to disregard improper testimony is almost always sufficient to protect a defendant from prejudice and we presume jurors understand and follow such an instruction. (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.) It is "only in the 'exceptional case' that any prejudice from an improperly volunteered statement cannot be cured by appropriate admonition to the jury." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 955.) Stolte has not shown that the curative instruction in this case was insufficient to protect him from any prejudice resulting from the brief reference to his prior prison term—much less that it amounted to structural error. Under these circumstances, we decline to exercise our discretion to reach the merits of Stolte's argument.

In the alternative, Stolte contends defense counsel's failure to move for mistrial constitutes ineffective assistance of counsel in violation of the Sixth Amendment. He argues his counsel's performance was deficient because there could be no tactical reason not to move for a mistrial. We disagree.

To establish ineffective assistance of counsel, a defendant must show that (1) the "representation fell below an objective standard of reasonableness under prevailing professional norms," and (2) counsel's deficient performance was prejudicial—i.e., there is a reasonable probability that, absent counsel's failings, the result would have been more favorable to the defendant. (*People*

*v. Scott* (1997) 15 Cal.4th 1188, 1211 (*Scott*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 693-694.) It is "particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record." (*Scott*, at p. 1212.) For this reason, the Supreme Court has repeatedly held that where the record "sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal must be rejected." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [cleaned up].)

Applying these principles, we cannot conclude on this record that defense counsel fell below an objective standard of reasonableness by failing to move for a mistrial. The record sheds no light on why defense counsel did not move for a mistrial. We also cannot say there could be no rational tactical explanation. Defense counsel may have assessed the chances of success as minimal and refrained from antagonizing the judge with a futile gesture. Moreover, because of the discretion afforded a trial court in granting a mistrial, it is rare that the merits of a mistrial motion are so clear that counsel's failure to make the motion would amount to ineffective assistance. (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Even if defense counsel believed the chances were positive, counsel may have refrained for fear that a second trial under less favorable circumstances would follow. Counsel could have determined any harm from the statement was minimal and would permit Stolte to explain that his prior prison time was for car theft almost ten years ago, giving him an opportunity to portray himself as someone who takes accountability, grew from his mistakes, and has since strived to be "a productive member of society."

16

Based on the record before us, we cannot conclude that defense counsel's failure to move for a mistrial after Mother's statement and the court's curative instruction rendered counsel's assistance ineffective.

C.

Third, Stolte claims the prosecutor committed prejudicial prosecutorial error by encouraging Grace's reference to him as a "terrifying villain" and vouching for her testimony. He also contends the prosecutor did not "stick to the facts and the evidence" during closing arguments, and instead encouraged the jury to speculate about his character and motivations. Recognizing defense counsel did not object below, Stolte urges this court to exercise its discretion to reach the merits because the misconduct violated his constitutional rights. In the alternative, he argues ineffective assistance of counsel. On the merits, we conclude no prosecutorial error occurred; therefore, Stolte's constitutional rights were not violated. We thus need not reach the issues of prejudice or ineffective assistance of counsel.

"In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Price* (1991) 1 Cal.4th 324, 447.) It is prosecutorial error to misstate the law or evidence, or to go beyond the record. (*People v. Fayed* (2020) 9 Cal.5th 147, 204; see also *People v. Gonzales* (2011) 51 Cal.4th 894, 947.) A defendant asserting misconduct based on the prosecutor's comments before the jury must establish a reasonable likelihood that the jury construed or applied the remarks objectionably. (*People v. Duff* (2014) 58 Cal.4th 527, 568.)

Stolte argues that after Grace identified him as he "who should not be named," the prosecutor committed error by later encouraging the comparison to a terrifying villain: Lord Voldemort who was referred to as "He-Who-Must-Not-Be-Named" in the popular *Harry Potter* book series. Even if the

17

prosecutor referred to Stolte as a villain, using derogatory epithets such as "monster," "sociopath," "reprehensible excuse for a human being," or "urban terrorist" is not prosecutorial error when warranted by the evidence. (*People v. Montes* (2014) 58 Cal.4th 809, 890.) However, contrary to Stolte's claim, the prosecutor did not "ma[k]e light of[ ] the Voldemort reference" or refer to Stolte as a villain at all. Later in her testimony, Grace had difficulty remembering what to call Stolte, asking, "I think the – what do you call him? I was about to say delinquent. Sorry." The prosecutor responded, "I think you called him earlier, he who should not be named." The prosecutor then asked why she called him that, and Grace explained, "Because I do not like to name him." The prosecutor did not use "slanderous comparisons of [Stolte] to an evil villain" or go beyond the bounds of fair commentary; rather, he helped keep Grace on track by identifying Stolte using her own terms.

No more convincing is Stolte's claim that the prosecutor committed prosecutorial error by vouching for Grace's testimony when he told her she was "the best" as he collected exhibits from her. Impermissible vouching may occur when prosecutors seek to bolster their case by placing the prestige of the government behind a witness through personal assurances of the witness's veracity or suggesting that evidence available to the government, but not before the jury, corroborates the witness's testimony. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) The record here shows the prosecutor was being polite and not commenting on any evidence, Grace's testimony, or her truthfulness. Rather, when collecting the exhibits, the prosecutor asked, "Can I have that one too?" Grace responded, "Of course." Then the prosecutor said, "You're the best. Thank you." Nothing in this exchange suggests the prosecutor sought to improperly bolster the People's case.

18

Stolte further claims that, during closing argument, the prosecutor encouraged the jury to assume facts about his character and motivations not supported by any evidence. A criminal prosecutor has wide latitude when making a closing argument. The argument can be strongly worded and vigorous so long as it fairly comments on the evidence, including reasonable inferences or deductions that can be drawn from that evidence. (*People v. Ward* (2005) 36 Cal.4th 186, 215.) Here, the People's theory of the case was that Stolte learned of Mother's and the children's vulnerability and took advantage of the opportunity to become close with the children and gain unsupervised access to commit the lewd acts.

Stolte quotes and takes issue with the prosecutor's argument discussing the circumstances of him moving onto the property, including that Mother was victimized in the past by her late husband, the children were not disciplined or well behaved, Mother and the children wanted someone to trust, he and Mother had an intimate relationship within the first day of meeting, and he developed an abnormal relationship with the children, spending one-on-one time with them and allowing them in his RV at night, within a week. Stolte also objects to the prosecutor's statements that the children were not trained witnesses and it was understandable that they did not remember everything. Finally, Stolte criticizes the prosecutor's argument about his credibility. Stolte, however, does not explain why these statements were neither supported by nor could be inferred from the evidence. No part of the argument asked the jury to make any inferences that could not reasonably be drawn from the evidence.

We conclude no prosecutorial error occurred.

D.

Finally, Stolte argues the matter must be remanded for resentencing because the trial court failed to recognize it had the discretion to sentence counts 9 and 10 concurrently instead of consecutively. He claims there was no evidence the acts alleged in those counts were committed on separate occasions for purpose of consecutive sentencing under sections 667.6 and 667.61. We disagree and conclude consecutive sentencing of counts 9 and 10 was required on this record.

Section 667.61 mandates consecutive sentences for each conviction of forcible lewd conduct upon a child under section 288(b) if the offenses "involve[d] the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subds. (c)(4), (i); *People v. Lopez* (2022) 76 Cal.App.5th 287, 291.) Section 667.6(d) provides that the court shall consider whether "the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed." The standard is broad and does not require an obvious break in the defendant's behavior or control over the victim. (*People v. Jones* (2001) 25 Cal.4th 98, 104.) "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

Applying this deferential standard, we conclude the trial court could reasonably decide that counts 9 (touching Sophia's vagina over her clothes) and 10 (touching Sophia's breasts over her clothes) occurred on separate occasions. The court agreed with Stolte's counsel and probation that counts 8, 9, and 14 constituted one overt act and counts 10, 11, 12, and 13

20

constituted another overt act for purposes of staying execution of sentences under section 654, which bars multiple punishments for acts that constitute a single course of conduct. (*People v. Lopez* (2020) 9 Cal.5th 254, 268, fn. 5.)

For the counts not barred by section 654, probation recommended consecutive sentences under section 667.6(d) because the acts alleged in those counts demonstrated independent behaviors and Stolte had the opportunity to stop his behavior. Stolte argues there was nothing in Sophia's trial testimony clearly differentiating the acts but fails to address her statements in the second interview that, at some point, she left the RV because she did not know what was "going on" and she "was getting really stressed." She got a sip of milk and went back to the RV, "then he continued." Based on this evidence, and as acknowledged by Stolte's own characterization of counts 9 and 10 as separate overt acts, a reasonable trier of fact could have found Stolte had adequate opportunity for reflection between those acts such that they occurred on separate occasions for purposes of consecutive sentencing under sections 667.6(d) and 667.61(i).

### III.

We reverse in part, affirm in part as modified, and remand for resentencing. The convictions on counts 1 through 5 and 8 through 14 for forcible lewd conduct under Penal Code section 288, subdivision (b)(1) are reduced to the lesser included offense of nonforcible lewd conduct under section 288, subdivision (a). The convictions on counts 6 and 7 for attempted forcible lewd conduct under sections 288, subdivision (b)(1) and 664 are reduced to attempted nonforcible lewd conduct under sections 288, subdivision (a) and 664. The judgment of conviction is affirmed as modified and in all other respects. The matter is remanded for resentencing. Upon resentencing, the trial court is directed to prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

CASTILLO, J.

WE CONCUR:


DO, Acting P. J.


BUCHANAN, J.